# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

Case No. 21-CR-169 (ECT/JFD)

Plaintiff,

**REPORT AND
RECOMMENDATION**

v.

HAROLD BENNIE KAEDING,

Defendant.

Under the authority of a search warrant issued by this Court, FBI Agents searched the home of Harold Bennie Kaeding, the Defendant. The search was part of a law enforcement investigation into allegations that Mr. Kaeding defrauded federal relief programs meant to ameliorate the economic harm caused by the COVID-19 pandemic. While the search was underway, an FBI Agent and an FBI forensic accountant interviewed Mr. Kaeding for about an hour and five minutes[1] without first giving him a *Miranda*

---

[1] In a pro se memorandum in support of his motions to suppress, Mr. Kaeding asserts that for half an hour before the FBI Agent turned on a recorder, he was subjected to "accusations," "interrogation," and "threats" by that agent. (Pro Se Mem. Supp. 4, Dkt. No. 161.) ("Mr. Burnham['s] accusations and interrogation continued for about 30 minutes before he started recording in the dining room at about 6:37 in the morning.") No evidence of the recorder being turned on late was introduced at the motions hearing in this case. Also, Mr. Kaeding's pro se statement contradicts the Motion to Suppress Statements filed by Mr. Kaeding's former counsel, which states that "[a]t 6:37 a.m., just moments after he put in his hearing aids, two of the agents *introduced themselves to Mr. Kaeding and began interrogating* him. . . ." (Am. Mot. Suppress Statements 2, Dkt. No. 77.) (emphasis added)

    The Court notes generally that Mr. Kaeding alleges numerous facts in his pro se memorandum that were never put into the record of this case. These events were not described by a witness testifying under oath, whose testimony was then tested by cross examination. Therefore, none of these unsworn facts have influenced the Court's decision on these three suppression motions.

warning. Although Mr. Kaeding was not arrested on the day of the search, he was arrested later. After Mr. Kaeding was arrested, his adult daughter came into possession of some of his documents and electronic devices. The prosecution obtained those documents and devices by serving Mr. Kaeding's daughter with a grand jury subpoena *duces tecum*, with which she complied. The parties disagree about how Mr. Kaeding's daughter got these items. (Tr. of Mot. Hr'g ("Tr.") 35:5–37:2, Dkt. No. 123.)

Mr. Kaeding now asks this Court to suppress the statements he gave while the search warrant was being carried out, noting the absence of a *Miranda* warning and also asserting that the statement was generally involuntary. Mr. Kaeding also asks the Court to suppress the evidence obtained through the warranted search of his home, saying that the information presented to the issuing magistrate judge was stale, that is, so much time elapsed between the events described in the affidavit supporting the search warrant application and the presentation of that application to a magistrate judge that it was not reasonable to conclude that the things the FBI was looking for would still be at Mr. Kaeding's house. Finally, Mr. Kaeding asks for suppression of the documents and devices that were subpoenaed from his daughter.

The United States responds that, as to Mr. Kaeding's statements, no *Miranda* warning was required because Mr. Kaeding, who was questioned in his own home, was not in custody, and the Supreme Court has held that a *Miranda* warning only needs to precede custodial questioning. The United States also argues that Mr. Kaeding's statement was voluntary. As to the search warrant, the United States asserts that the nature of the information being sought by the search warrant—financial documents and computers—

was a type of evidence that courts have recognized goes stale slowly. When it comes to the grand jury subpoena to Mr. Kaeding's daughter, the United States claims that Mr. Kaeding voluntarily conveyed the documents and devices to his daughter and that when he did so he assumed the risk that she would disclose that evidence to the authorities. As of the motions hearing, the United States had not examined the electronic devices obtained by grand jury subpoena and had undertaken not to do so without a search warrant, although it had read the documents. (Tr. 36:6–10; 39:9–39:16.) The case has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. The Court held a hearing on the motions on April 28, 2023. (Hr'g Mins., Dkt .No. 117.) Assistant United States Attorneys Jordan Sing and Robert Lewis represented the United States and Karen Mohrlant, Esq. and Lee Johnson, Esq. represented Mr. Kaeding. (*Id.*) Before post-hearing briefing was complete, Mr. Kaeding elected to represent himself and submitted his briefing pro se. (Order 1–2, Dkt. No. 147.) The undersigned recommends that the motions be denied in all respects.

## I.    PROCEDURAL BACKGROUND AND FACTS[2]

Mr. Kaeding is accused in a superseding indictment (Dkt. No. 105) of three counts of wire fraud, three counts of aggravated identity theft, and one count of money laundering.

---

[2]About two months ago this Court wrote a fairly long, detailed description of the history of this case, *see* Order Denying Motion for Reconsideration of Detention (Dkt. No. 154). Only those additional facts and procedural events necessary to understanding these three suppression motions are set out here. This Report and Recommendation contains everything needed to understand the rulings on Mr. Kaeding's three suppression motions,

Mr. Kaeding is alleged to have submitted false applications for loans guaranteed by the Small Business Administration that were meant to provide relief to businesses that suffered economic harm because of the COVID-19 pandemic. (Superseding Indictment ¶¶ 1, 8.) The total amount of the loans for which Mr. Kaeding applied was just over $2.18 million, and the grand jury alleged he actually obtained $658,490. (*Id.* ¶¶ 18–23.) Another $984,100 was disbursed but recalled before it reached Mr. Kaeding, and $378,255, although applied for, was never disbursed at all. (*Id.*)

Shortly after six o'clock on the morning of January 13, 2021, seventeen law enforcement personnel went to Mr. Kaeding's Eden Prairie home with a search warrant issued by a magistrate judge of this Court. (Tr. 50:6–12.) Both the United States and Mr. Kaeding agree that law enforcement made a forcible entry into the home. Mr. Kaeding's former counsel claims that "17 law enforcement officers broke down the door of Mr. Kaeding's home and stormed into his residence." (Am. Mot. to Suppress Statements 1.) The lead FBI Agent on the case, Special Agent Burnham, testified at the motions hearing that the door was forced open, but not by all 17 agents, and was done only after Mr. Kaeding's spouse refused to open the door for them, and ran from the front door further into the house, causing apprehension that she might be going to destroy evidence or retrieve a weapon. (Tr. 43:12–45:7; 51:16–52:21.) Law enforcement broke down the door with a ram and an undetermined number of law enforcement officers entered the home with their guns drawn. Once the home was secured and all persons were accounted for, the law

---

but if further context is desired, the reader is respectfully directed to the Order Denying Motion for Reconsideration. (Dkt. No. 154.).

enforcement officers holstered their weapons. (Tr. 52:25–53:16.) They did not draw their weapons again during the search. (*Id.*)

Mr. Kaeding asserts that he did not have his hearing aids in when he went to see what was going on and so he could not understand what the agents were saying. (Pro Se Mem. in Supp. of Mots. 1.)[3] However, he adds that he understood (apparently after inserting the hearing aids) that the lead FBI agent was offering to leave his wife and son alone if Mr. Kaeding would take responsibility for the alleged fraud. (Pro Se Mem. Supp. 4.) The lead FBI Agent was not questioned about this accusation at the motions hearing. The prosecution states that Mr. Kaeding was told he was not under arrest, that he was in fact free to leave and that he was not going to be arrested unless evidence of an additional crime was turned up during the search. (Tr. 59:1–60:12.) It is undisputed that Mr. Kaeding was not advised of his rights under *Miranda v. Arizona*. (Tr. 73:21–22.) Mr. Kaeding spoke to the lead FBI Agent and a forensic accountant in a room of his home for about one hour

---

[3] In his Pro Se Memorandum, Mr. Kaeding makes extensive, detailed factual claims for which there is no support in the record. For example, he says two agents came through the back door, that he was handcuffed, marched through the house at gunpoint, and "forced" into a recliner. (Pro Se Mem. Supp. 4.) At the motions hearing, there was testimony only about the front door and none about the back door. (Tr. 51:21–52:21; 68:23–70:9.) Although the lead agent testified that he did not recall one way or the other whether Mr. Kaeding was handcuffed (*Id.* at 73:19–20), he unequivocally testified that during the interview, Mr. Kaeding was not in handcuffs (*Id.* at 63:3–13.) There is no mention anywhere in the record of Mr. Kaeding being marched anywhere (much less at gunpoint), and the hearing testimony was that once the questioning of Mr. Kaeding concluded, he got into a recliner and, after being given a pillow and a blanket, fell asleep. (*Id.* at 64:1–20.)

If there were facts Mr. Kaeding wished to make use of, it was his responsibility to put those facts into the record, either by eliciting them from cross-examination of the prosecution's witnesses, or by calling a witness of his own. The Court will not consider unsupported factual allegations in Mr. Kaeding's post-hearing briefing.

and five minutes. (Pl.'s Ex. 1, described in Exhibit List, Dkt. No. 119.). Mr. Kaeding chose to answer some questions and declined to answer others. (Tr. 60:18–61:22.) The FBI did not pressure Mr. Kaeding to answer any questions to which he chose not to respond. *Id.*

About fourteen months later, in March of 2022, after Mr. Kaeding was in custody, the grand jury issued a subpoena *duces tecum* to Mr. Kaeding's adult daughter for documents and tangible things that she was holding for safekeeping after his arrest. (Mot. to Suppress Evid. Obtained by Grand Jury Subpoena Duces Tecum 1, Dkt. No. 74.) Mr. Kaeding describes the subpoenaed items as "a 'box of documents,' computers, cell phones, and other items." (*Id.* at 2.) The United States avers that it has not examined any of the electronic devices turned over pursuant to the grand jury's subpoena and will not do so unless it first obtains a search warrant. (Resp. of the U.S. to Def.'s Pretrial Mots. 9–10; Tr. 36:6–10.)

## II.    ANALYSIS

Mr. Kaeding seeks suppression of evidence on three grounds. First, he challenges the use of his statements against him because he did not receive a *Miranda* warning before talking to law enforcement and because his statement was not voluntary. Second, he argues that the warrant to search his home was invalid because it relied on stale information. Third, he asks that the documents provided by his daughter be supressed because law enforcement never received a warrant to seize the property. The Court will address each argument in turn.

6

    **A.**      **No *Miranda* Warning Was Necessary and Mr. Kaeding's Statements Were Voluntary.**

           ***i.*    Because Mr. Kaeding Was Not in Custody When Law Enforcement Questioned Him, No Miranda Warning Was Needed.***

Recognizing the potential that "the interplay of interrogation *and custody* would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination," *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980), the Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from *custodial* interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (Emphasis added)

As these two quotes explain, the requirement to administer the well-known *Miranda* warning arises only when a suspect is questioned while in custody. Mr. Kaeding was certainly questioned, but whether he was in custody when speaking to law enforcement in his own home requires further analysis. A suspect is "in custody" and a *Miranda* warning is required before questioning if the suspect has been formally arrested or "*under any other circumstances* where the suspect is deprived of his freedom of action in *any* significant way." *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990). If a reasonable person in the suspect's position would believe his freedom of action had been curtailed to a "degree associated with a formal arrest," and that belief, analyzed under the totality of the circumstances, is reasonable from an objective viewpoint, then the suspect is in custody, no matter where he or she is. *Id.* at 1347. The defendant in *Griffin*, like Mr. Kaeding, was

questioned by two agents in his own home. *Id.* at 1346 (citing *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984)). In *Griffin*, the Eighth Circuit found the following factors useful in deciding whether a suspect is in custody when being questioned:

> **Freedom of Action.** Was the suspect free to leave? The *Griffin* court reiterated that the suspect's freedom of movement and action continued to be a "critical factor" in the custody analysis, while the remaining factors had "inconclusive, independent relevance" in the inquiry. *Id.* at 1348.

> **The Purpose of the Interrogation.** What was law enforcement's purpose for the questioning? Was it to obtain incriminating information from the target of their investigation? The *Griffin* court found this relevant only in the sense that it "contributes to the suspect's sense of custody," and noted that the factor did not "weigh heavily" in the analysis. *Id.*

> **The Location of the Interrogation.** Was the suspect questioned at a police station or at a place of employment, a public place, or the suspect's own home? *Id.*

> **The Length of the Interrogation.** While the *Griffin* court labeled this factor "length," its discussion of this factor shows it actually was concerned not with the length of the interrogation alone but with whether law enforcement gave the detainee the message "that questioning will continue until he provides his interrogators the answers they seek." *Id.* at 1348 (quoting *Berkemer*, 468 U.S. at 439).

**Indicia of Custody.** This factor breaks down into the non-exhaustive sub-factors of (1) whether the suspect was told that the questioning was voluntary, that they were free to leave or request that the officers leave, or that they were not under arrest; (2) whether the suspect's freedom of motion was unrestrained during the questioning; (3) whether the suspect contacted law enforcement or voluntarily agreed to their request for information; (4) whether officers used "strong arm tactics or deceptive stratagems" during the questioning; (5) whether the atmosphere of the questioning was "police-dominated"; and (6) whether the suspect was arrested after questioning. *Id.* at 1349.

Application of the *Griffin* factors to Mr. Kaeding's situation on the morning of January 13, 2021 shows that Mr. Kaeding was not in custody and that a *Miranda* warning was therefore not required. While the purpose factor weighs very slightly in favor of a finding of custody, freedom of movement, location, length, and indicia of custody factors all suggest that Mr. Kaeding was not in custody. Law enforcement was therefore not required to read Mr. Kaeding a *Miranda* warning before questioning him. To start, Mr. Kaeding was the subject of an ongoing investigation, but one without a clear target because the FBI was investigating potentially fraudulent loans in the name of Mr. Kaeding, his wife, and his son. (Tr. 47:10–48:23.) All the loans traced back to the same address. (*Id.* at 47:14–23.) Officers were seeking information from Mr. Kaeding, who was one of multiple suspects in the case. (Tr. 73:4–7.) However, officers did not restrict his freedom of

movement during questioning.[4] He was not handcuffed, no weapons were brandished, and after the interview Mr. Kaeding was helped to a recliner, where he fell asleep after being given a blanket and pillow. (Tr. 59:21; 63:6–7.) Mr. Kaeding was questioned in his own home, and there is no evidence law enforcement tried to intimidate him by stating that he would be questioned until he said the things law enforcement wanted to hear.

Turning to the indicia of custody, Mr. Kaeding was told he did not have to answer questions, but with the warning that if he chose to answer questions, his answers had to be truthful: "S.A. Burnham: It's a crime if you decided that you didn't want to tell me the truth. Mr. Kaeding: No, but if I don't talk to you? S.A. Burnham: No, there's no problem with that at all. It's totally up to you. Mr. Kaeding: Okay." (Pro Se Mem. Supp. at 5 (quoting transcript of recorded statement)).In his pro se memorandum, Mr. Kaeding complains that this information was conveyed to him in the form of five questions to which he was not given a chance to respond, relying on the following passage from the interview transcript to support his claim:

> So like I said, you're not under arrest, you're free to take off and leave the house until we're done with the search warrant if you wanted to, okay? And you're not going to be arrested today, okay? Unless we discover some other crime that's already occurred. So we have to say that is a crime, like something would necessitate being a crime, right? Okay? So in essence, this is our 1001 statement. So if you could just sign that for me. All that says is that I told you you can't make false statements to me. Fair enough?

---

[4] On cross-examination, the lead investigator did note that if Mr. Kaeding went to the bathroom during the questioning, he would have needed to have been accompanied by law enforcement, for officer safety. (Tr. 78:12–20.)

(Tr. 77:5–11 (quoting transcript).) Mr. Kaeding responded "Gotcha." (*Id.*) Mr. Kaeding's criticism of the form in which this information was conveyed to him—a series of rhetorical questions—does not undercut the Court's conclusion that Mr. Kaeding was advised that he was free not to talk to law enforcement. If one removes the words "okay," "right," and "fair enough" these questions become statements, to which no response is required. Mr. Kaeding was told he was not under arrest, that he was free to leave, that it was fine if he chose not to speak to agents, but if he did decide to speak with agents, he could not lie. Mr. Kaeding does not claim he did not understand what he was being told.[5]

Mr. Kaeding's former counsel argues that the FBI Agent undercut these assurances by telling Mr. Kaeding he would not be arrested that day "unless we discover some other crime that's already occurred" and that the assurances were further undercut when the agent asked Mr. Kaeding to sign a written advisory about the consequences, under 18 U.S.C. § 1001, of lying to a federal agent about a material fact. Neither former counsel nor Mr. Kaeding argue that either the FBI Agent's remark about the possibility of arrest if a crime other than the one under investigation was discovered, or the text of the advisory that Mr.

---

[5] Mr. Kaeding *does* claim that embedded within the literal words spoken by Special Agent Burnham was an offer from Special Agent Burnham to Mr. Kaeding that if Mr. Kaeding would take responsibility for the crimes under investigation, Mr. Kaeding's wife and son would not be further investigated. This claim is analyzed fully in the section of this Report & Recommendation devoted to Mr. Kaeding's claim that his statement was involuntary, but suffice it to say at this juncture that this claim is not supported by any evidence in the hearing record. At this point, the Court limits itself to finding that no such offer can be found in the words spoken by Special Agent Burnham, but later, the Court will find that no such offer can be inferred from the context within which those words were spoken.

Kaeding signed, was legally incorrect. The Court finds that neither the agent's oral statements, nor the written advisory, contained any misstatements of law.

Nor has this Court's review of the record revealed any evidence that the agent's statements or the written advisory had any effect on Mr. Kaeding's decision to speak with law enforcement. To the contrary, by the time the agent made these statements and Mr. Kaeding signed the advisory, his hearing aids were in place, his response to the agent was "gotcha," and he neither asked questions nor expressed apprehensions about anything he had heard or read.

While Mr. Kaeding did not initiate contact with law enforcement, he did respond to law enforcement's questions after being told, as quoted above, that speaking to law enforcement was voluntary. Mr. Kaeding's contrary claim, that his decision to speak with law enforcement was not voluntary, is unpersuasive. This claim of Mr. Kaeding's goes both to the *Griffin* factor and to the general voluntariness of his statement and it has two components. The first is a claim that law enforcement used inappropriately heightened levels of force in executing a white-collar search warrant for documents; seventeen agents and officers participated in the search, they gained entry to the house with a battering ram, and at least during the initial entry into the home they carried their firearms in their hands. The second component, advanced only by Mr. Kaeding in his pro se memorandum and going only to general voluntariness and not to the *Griffin* factor, is a claim that he spoke to law enforcement because they promised him that if he did so, law enforcement would concentrate their investigation on Mr. Kaeding and leave his wife and son alone. This second component of Mr. Kaeding's involuntariness argument is analyzed further below.

12

Mr. Kaeding's claim that his decision to speak to law enforcement was involuntary because of the manner of law enforcement's entry fails. Special Agent Burnham testified at the motions hearing that each of the measures taken at the beginning of the search was justified by the situation confronting law enforcement when they arrived at Mr. Kaeding's house, and the agent disavowed using any of these measures in the hope of frightening Mr. Kaeding. Seventeen people were needed to search "a very large house" for the records of "multiple businesses," especially when there were multiple people living in the house, all of whom needed to be interviewed and at least one of whom apparently could not communicate except with the assistance of an interpreter. (Tr. 51:1–15.) Forcible entry was necessary because when Special Agent Burnham showed his credentials through the glass of the front door to Mr. Kaeding's wife, instead of opening the door, she turned and ran, raising concerns that she might be fetching a weapon or attempting to destroy evidence. (*Id*. at 52:14–15.) This is also the reason the agents first entered the home with their firearms drawn, although those were put back in their holsters once the agents knew the house was secure. (*Id*. at 53:13–16.) While these events were no doubt stressful and upsetting, by the time the interview of Mr. Kaeding began, the house had been secured for approximately five minutes, law enforcement had put away their guns, everyone in the house had been gathered in the living room where they received an explanation of why law enforcement was in the house, and Special Agent Burnham had explained to Mr. Kaeding

13

that he was free to decline to answer questions. Any stress caused by the manner of law enforcement's entry had been dissipated by these measures.[6]

While the Eighth Circuit has not considered the question of whether a forced entry by armed police officers renders a subsequent statement involuntary, the Ninth Circuit has, and this Court finds its reasoning persuasive. In *United States v. Banks*, 282 F.3d 699, 706 (9th Cir. 2002) the defendant, Mr. Banks, was in the shower and so did not hear officers at his front door, with a search warrant, knocking and announcing their purpose. Moments later, Mr. Banks, "naked, wet, and soapy," was confronted by armed SWAT team officers who had just forced their way into his apartment. Mr. Banks, who also claimed to have been under the influence of drugs and alcohol, moved to suppress the statements he made to law enforcement, saying "he was terrorized by the entry of the police into his home, intimidated by officers employing the 'good-cop versus bad-cop' routine, and in fear of being paraded naked around the neighborhood." 282 F.3d at 705–06. The Ninth Circuit, although it reversed Mr. Banks' conviction because it held that the police had not waited

---

[6] It may be objected that the subjective intentions of law enforcement are irrelevant to deciding whether a statement was voluntary and that therefore the fact that law enforcement forcibly entered the house because of concern about weapons or destruction of evidence is of no importance. While it is true that the objective conditions under which an interrogation is conducted control a voluntariness inquiry, and not the subjective perceptions of either law enforcement or the person being questioned, law enforcement's subjective intentions and perceptions can be relevant to an analysis of voluntariness if they are conveyed to the subject. *Stansbury v. California*, 511 U.S. 318, 325 (1994). Here, not only did the objective circumstances of the interview vitiate any lingering stress from the forced entry, but if Mr. Kaeding did perceive anything about law enforcement's reasons for forced entry, he would have perceived that the forced entry was made for reasons other than attempting to intimidate him.

long enough to force entry,[7] gave short shrift to Mr. Banks' claims that his statements were involuntary. The court noted that Mr. Banks was calm and able to reason, that he (like Mr. Kaeding) answered some questions but would not answer others and understood his circumstances.

Mr. Kaeding, like Mr. Banks, understood his circumstances. Mr. Kaeding has not come forward with any evidence of raised voices, slaps on the table, threats of violence, or any other threats or promises (with the exception of the allegation discussed below) that would have overborne Mr. Kaeding's free will. Any shock he may have experienced due to the forced entry appears, on the evidence, to have dissipated.

As to the final two *Griffin* factors, the atmosphere was not police-dominated. Although 17 members of law enforcement were in the house, Mr. Kaeding was interviewed in a room occupied only by him, an agent, and an accountant. (Tr. 58:6–16.) Finally, Mr. Kaeding was not arrested when the search concluded.

In sum, the *Griffin* factors tend to show that Mr. Kaeding was not in custody for *Miranda* purposes when Special Agent Burnham interviewed him. The Court finds that Mr. Kaeding was not in custody and that no *Miranda* warning was required before questioning.

### ii.    *Mr. Kaeding's Statement Was Voluntary.*

Over and above his *Miranda* claim, Mr. Kaeding makes a claim that his statement was generally involuntary. The Court disagrees.

---

[7] The Supreme Court later reversed the Ninth Circuit and held the police had in fact waited long enough before forcing entry. *United States v. Banks*, 540 U.S. 31 (2003).

A suspect's statement to law enforcement is involuntary if it is "extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001)). Involuntary statements cannot be introduced into evidence against a criminal defendant at trial. *Vega v. Tekoh*, 597 U.S. 134, 141 (2022). A statement cannot be found involuntary without some coercive police tactics. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Put differently, no matter how fragile a suspect is, due to their mental health, substance use, lack of sleep, or other characteristics, a statement can never be found involuntary purely on the basis of the suspect's attributes; law enforcement's actions must always be part of the calculus. (*Id.* at 164.)

Mr. Kaeding relies upon two alternative aspects of police behavior to support his assertion that his statement to Special Agent Burnham was involuntary. First, he claims that law enforcement's forced entry into his home, the large number of law enforcement personnel involved in the search, and their drawn firearms were a threat. This claim is in both the motion filed by Mr. Kaeding's former counsel and in Mr. Kaeding's pro se memorandum, it has been analyzed above in this Report and Recommendation, and it is not necessary to belabor the point again here.

The second claim, found only in Mr. Kaeding's pro se memorandum, is premised upon the existence of a supposed bargain between Mr. Kaeding and Special Agent Burnham in which Mr. Kaeding would speak to Agent Burnham and in return, the focus of Agent Burnham's investigative efforts would move away from Mr. Kaeding's wife and

son. If true, such a promise could be the sort of promise that would overbear a suspect's will under *LeBrun*. In support, Mr. Kaeding cites page 65 of the motions hearing transcript for the statement that "Mr. Burnham said if Mr. Kaeding took responsibility they would leave his wife and son alone. Mr. Kaeding agreed." (Pro Se Mem. Supp. 4.) But nowhere at all in the transcript of the motions hearing is there testimony about such a bargain. Finally, if the agreement described by Mr. Kaeding really existed, Mr. Kaeding did not honor it, because throughout the interview Mr. Kaeding, as was his prerogative, declined to answer some questions and in his responses to those questions he did answer, he denied responsibility for any financial misconduct related to his applications for COVID-19 relief. In sum, this claim of Mr. Kaeding's has no evidentiary support and because of that the Court specifically finds there was no promise that if Mr. Kaeding talked to law enforcement, law enforcement would leave Mr. Kaeding's family alone.

### B.  The Warrant to Search Mr. Kaeding's Home Did Not Rely on Stale Information.

Mr. Kaeding moves to suppress the evidence recovered from his home on the grounds that the search warrant was stale, that is, that the search warrant was executed too long after the events described in the affidavit for it to be concluded that the items to be searched for would still be in Mr. Kaeding's house. As the United States correctly points out in its memorandum in opposition to this motion, numerous courts have held that persons involved in fraud hang on to documentary and electronic evidence of that fraud for multiple reasons, including the ongoing usefulness of the documents.

When Mr. Kaeding's residence was searched in January of 2021, law enforcement was looking for information pertaining to a fraud scheme that may have had at its center fraudulent loan applications made in April and May of 2020 (eight or nine months before the residence was searched), but which also included the alleged payment of fraud proceeds to prevent a home foreclosure only three months before the search warrant was sought. The type of crime under investigation is important in a staleness analysis. *United States v. Horn*, 187 F.3d 781, 786 (8th Cir. 1999) (citing *United States v. Koelling*, 992 F.2d 817, 822 (8th Cir. 1993)) ("The timeliness of the information supplied in an affidavit depends on . . . the nature of the crime under investigation; the lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated."). Because the crime being investigated here was fraud, this warrant was not stale. *See United States v. Miller*, No. 20-CR-232 (JRT/BRT), 2022 WL 4127546 (D. Minn. May 31, 2022) (upholding search warrant in fraud case supported by four to six-month old information); *United States v. Jokhoo*, No. 12-CR-309 (DSD/JJK), 2013 WL 3479416 (D. Minn. July 11, 2013) (upholding search warrant issued in fraud case notwithstanding staleness argument, but noting that older information had been refreshed); *United States v. Perry*, No. 4:11-CR-106 (AGF/FRB), 2011 WL 7277563 *10 (E.D. Mo. Oct. 26, 2011) (upholding a search warrant in a fraud case against a staleness challenge, noting that "[t]he evidence here showed that the defendant had participated in an ongoing scheme to defraud"); *United States v. Nealy*, No. 4:04-CR-274-02 (JLH), 2009 WL 481735 at *7 (E.D. Ark., Feb. 25, 2009) ("Information pertaining to loans and mortgages generally is maintained for years, so the fact that the affidavit indicated that it had been some sixteen

18

months . . . did not show that the information was too stale to support probable cause.").The Court recommends that Mr. Kaeding's motion to suppress evidence found in a warranted search be denied.

### C. Materials Obtained by Grand Jury Subpoena Should Not Be Suppressed.

Mr. Kaeding's final motion seeks suppression of some materials, including documents and computers, that the United States obtained by grand jury subpoena served on Mr. Kaeding's adult daughter. Because Mr. Kaeding has not demonstrated that he had a reasonable expectation of privacy in these materials, the Court recommends that this motion be denied.

There is no evidence as to how the documents and computers wound up with Mr. Kaeding's daughter. The argument of the United States is that because Mr. Kaeding voluntarily conveyed the materials to his daughter, Mr. Kaeding assumed the risk that his daughter would disclose the materials to the authorities. However, the United States makes this argument without the benefit of evidence showing that Mr. Kaeding in fact gave the materials to his daughter of his own free will. Mr. Kaeding, though, does no better. He states that his family members went through his things after he had been arrested and detained and that they then carried various items off for safekeeping. There is no more evidence of that than there is of the prosecution's opposing theory. Given the absence of facts, the motion must be resolved procedurally—by analyzing which party has the burden of proof—rather than on the factual merits.

At the motions hearing, the question of the burden of proof was raised, though without labeling it explicitly as such:

| [AUSA] Sing: | Your Honor, I do remain confused about how we're going to brief the subpoena issue if there's no testimony unless the defense is not planning on calling anyone for the factual dispute. |
| The Court: | I think that the defense, who goes first [in briefing], needs to explain that even in the absence of testimony this motion should be granted. Is that correct, Mr. Johnson [defense attorney]? |
| Mr. Johnson: | That's correct, Your Honor. |
| AUSA Sing: | Thank you, Your Honor. |

(Tr. 85:16–85.) Unfortunately, despite stating that he understood he would have to explain why his suppression motion should be granted "even in the absence of testimony," when the defense brief was filed, there was no discussion of how the suppression motion could be granted in the absence of a factual showing of a constitutional violation.

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, but on the government to justify a warrantless search." *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) (internal citations omitted). The issue thus becomes whether serving a subpoena on Mr. Kaeding's daughter was a warrantless search[8]—if it was, the United States has the burden of proof and if it was not, Mr. Kaeding has the burden of proof. Whichever party has the burden of proof will lose this motion because neither party put in any evidence on how Mr. Kaeding's belongings got to his daughter

---

[8] Similarly, a subpoena to appear before a grand jury is not a Fourth Amendment seizure. *United States v. Dionisio*, 410 U.S. 1, 10 (1973). When a third party is subpoenaed for documents in a criminal case, that generally does not trigger Fourth Amendment protection for the defendant because one does not have a constitutionally protected right to privacy in what one shares with a third party. *United States v. Miller*, 425 U.S. 435, 441–43 (1976).

Obtaining materials by subpoena is not a search, *United States v. Gratkowski*, 964 F.3d 307, 310–313 (5th Cir. 2020), unless the subpoenaed information provides law enforcement with "an all-encompassing record of the holder's whereabouts" and "provides an intimate window into a person's life, revealing not only [an individual's] particular movements, but through them [their] familial, political, professional, religious, and sexual associations." *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) (internal quotation marks and citation omitted). A subsequent search of the materials obtained by subpoena is a search, but the United States avers that it has not searched the things it got from Mr. Kaeding's daughter and that it will not do so without a warrant.

The Court cannot conceive how examining a box containing electronics and some documents of unspecified nature can be as invasive as mining the historical cell-site location information at issue in *Carpenter*. It was the defense's burden (and opportunity) to explain the analogy, but it declined to do so. In the absence of any explanation, the Court finds that there was no search of the material, let alone a warrantless search. If no search occurred, there is nothing for the government to justify and Mr. Kaeding has failed to meet his burden of proof on his motion to suppress. The Court recommends that the motion to suppress materials received via subpoena from Mr. Kaeding's daughter be denied.

## III.    RECOMMENDATION

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Mr. Kaeding's Amended Motion to Suppress Statements (Dkt. No. 77) be **DENIED**;

2. Mr. Kaeding's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. No. 78) be **DENIED**; and

3. Mr. Kaeding's Motion to Suppress Evidence Obtained by Grand Jury Subpoena Duces Tecum (Dkt. No. 74) be **DENIED**.

Date: December 11, 2023                 *s/ John F. Docherty*
                                        JOHN F. DOCHERTY
                                        United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.

A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).